UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JOE HARRISON,

     Applicant,

v.                                                              CASE NO. 8:16-cv-704-T-23AEP

SECRETARY, Department of Corrections,

     Respondent.

_____/


## ORDER

     Harrison applies under 28 U.S.C. § 2254 for the writ of habeas corpus (Doc. 1) and challenges his convictions for both three counts of sexual battery on a minor and a count of lewd and lascivious molestation of a minor, for which Harrison is imprisoned for life.  Numerous exhibits ("Respondent's Exhibit __") support the response.  (Doc. 14)  The respondent both admits the application's timeliness (Doc. 12 at 3) and argues that Ground Two is procedurally barred from federal review.  (Doc. 12 at 15–16)

## I. BACKGROUND[1]

     Harrison met I.K. at a Boys and Girls Club in Georgia where Harrison was the education director.  I.K., who was five years old, frequently got into trouble at

---

[1] This summary of the facts derives from Harrison's brief on direct appeal. (Respondent's Exhibit 2)

the club.  Harrison took I.K. under his supervision with the permission of I.K.'s mother.  Five years later, Harrison moved to Florida.

Harrison contacted I.K.'s mother several years later.  I.K.'s mother said that I.K. had good days and bad days at school.  Harrison suggested that I.K. spend the summer with him and I.K.'s mother agreed.  When I.K.'s mother lost her job and had health problems, Harrison suggested that I.K. live with him and go to school in Florida.  I.K.'s mother agreed and gave Harrison legal guardianship of I.K., who was thirteen.

I.K.'s grades in school improved but his conduct did not.  A female student accused I.K. of exposing his penis.  When an assistant principal confronted I.K. with the accusation, I.K. said that Harrison had sexually molested him.  The school contacted the police and Harrison.  Detectives and Harrison came to the school.

Harrison followed the detectives to the police station where the detectives interrogated Harrison.  Harrison initially denied any sexual contact with I.K. but ultimately accused I.K. of raping him.  Harrison claimed that I.K. physically restrained him and had anal sex with him against his will.  Harrison also admitted that he had touched I.K.'s penis and had oral sex with I.K.

Harrison was charged with four counts of sexual battery on a minor and one count of lewd and lascivious molestation of a minor.  The jury found Harrison not guilty of one count of sexual battery and guilty of the remaining four counts as charged.  The trial court sentenced Harrison to three concurrent life sentences for

the sexual battery convictions and 15 years for the lewd and lascivious molestation conviction.

## II. <u>EXHAUSTION AND PROCEDURAL DEFAULT</u>

The respondent argues that Ground Two is procedurally barred from federal review because Harrison failed to exhaust his available state court remedies. An applicant must present each claim to a state court before raising the claim in federal court.  "[E]xhaustion of state remedies requires that petitioners 'fairly presen[t]' federal claims to the state courts in order to give the State the 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971)).  *Accord Rose v. Lundy*, 455 U.S. 509, 518–19 (1982) ("A rigorously enforced total exhaustion rule will encourage state prisoners to seek full relief first from the state courts, thus giving those courts the first opportunity to review all claims of constitutional error.").  "To provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." *Baldwin v. Reese,* 541 U.S. 27, 32 (2004) (citing *Duncan*, 513 U.S. at 365–66).

### <u>Ground Two:</u>

Harrison asserts that the trial court violated his federal constitutional rights by prohibiting him from both cross-examining witnesses and calling character witnesses. Harrison argues that he presented this claim as a violation of a federally protected

right on direct appeal by citing *Lewis v. State*, 570 So. 2d 412 (Fla. 1st DCA 1990). (Doc. 16 at 24)  Because *Lewis* both cited *Davis v. Alaska*, 415 U.S. 308 (1974), and addressed the federal constitutional right to confront witnesses, Harrison alerted the state court to the federal nature of his claim.  *Reese,* 541 U.S. at 32 ("A litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state-court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'"); *Wells v. Sec'y Dep't Corrs.*, 343 F. App'x 581, 583–84 (11th Cir. 2009) ("Since Wells cited as part of his unavailability claim 'a case deciding such a claim on federal grounds,' he sufficiently showed a desire to raise a federal issue.") (quoting *Reese*, 541 U.S. at 32).  Ground Two is entitled to a review on the merits.

### III.  <u>STANDARD OF REVIEW</u>

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs this proceeding.  *Wilcox v. Florida Dep't of Corr.*, 158 F.3d 1209, 1210 (11th Cir. 1998), *cert. denied*, 531 U.S. 840 (2000).  Section 2254(d), which creates a highly deferential standard for federal court review of a state court adjudication, states in pertinent part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> > resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

> established Federal law, as determined by the
> Supreme Court of the United States; or
>
> resulted in a decision that was based on an
> unreasonable determination of the facts in light
> of the evidence presented in the State court
> proceeding.

*Williams v. Taylor*, 529 U.S. 362, 412–13 (2000), explains this deferential

standard:

> In sum, § 2254(d)(1) places a new constraint on the power of a
> federal habeas court to grant a state prisoner's application for a
> writ of habeas corpus with respect to claims adjudicated on the
> merits in state court. Under § 2254(d)(1), the writ may issue
> only if one of the following two conditions is satisfied — the
> state court adjudication resulted in a decision that (1) "was
> contrary to . . . clearly established Federal Law, as determined
> by the Supreme Court of the United States" or (2) "involved an
> unreasonable application of . . . clearly established Federal law,
> as determined by the Supreme Court of the United States."
> Under the "contrary to" clause, a federal habeas court may
> grant the writ if the state court arrives at a conclusion opposite
> to that reached by this Court on a question of law or if the state
> court decides a case differently than this Court has on a set of
> materially indistinguishable facts. Under the "unreasonable
> application" clause, a federal habeas court may grant the writ if
> the state court identifies the correct governing legal principle
> from this Court's decisions but unreasonably applies that
> principle to the facts of the prisoner's case.

"The focus . . . is on whether the state court's application of clearly established

federal law is objectively unreasonable, . . . an unreasonable application is different

from an incorrect one." *Bell v. Cone*, 535 U.S. 685, 693 (2002). "As a condition for

obtaining habeas corpus from a federal court, a state prisoner must show that the

state court's ruling on the claim being presented in federal court was so lacking in

justification that there was an error well understood and comprehended in existing

law beyond any possibility for fairminded disagreement." *Harrington v. Richter*,

562 U.S. 86, 103 (2011).  *See White v. Woodall*, 572 U.S. 415, 427 (2014) ("The

critical point is that relief is available under § 2254(d)(1)'s unreasonable-application

clause if, and only if, it is so obvious that a clearly established rule applies to a given

set of facts that there could be no 'fairminded disagreement' on the question . . . .")

(citing *Richter*); *Woods v. Donald*, 575 U.S. 312, 316 (2015) ("And an 'unreasonable

application of ' those holdings must be objectively unreasonable, not merely

wrong; even clear error will not suffice.") (citing *Woodall*, 572 U.S. at 419).

*Accord Brown v. Head*, 272 F.3d 1308, 1313 (11th Cir. 2001) ("It is the objective

reasonableness, not the correctness *per se*, of the state court decision that we are to

decide.").  The phrase "clearly established Federal law" encompasses only the

holdings of the United States Supreme Court "as of the time of the relevant

state-court decision." *Williams v. Taylor*, 529 U.S. at 412.

The purpose of federal review is not to re-try the state case.  "The [AEDPA]

modified a federal habeas court's role in reviewing state prisoner applications in

order to prevent federal habeas 'retrials' and to ensure that state-court convictions

are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. at 694.

A federal court must afford due deference to a state court's decision.  "AEDPA

prevents defendants — and federal courts — from using federal habeas corpus review

as a vehicle to second-guess the reasonable decisions of state courts." *Renico v. Lett*,

559 U.S. 766, 779 (2010).  *See also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) ("This

is a 'difficult to meet,' . . . and 'highly deferential standard for evaluating state-court

rulings, which demands that state-court decisions be given the benefit of the doubt' . . . .") (citations omitted).

When the last state court to decide a federal claim explains its decision in a reasoned opinion, a federal habeas court reviews the specific reasons as stated in the opinion and defers to those reasons if they are reasonable. *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018) ("[A] federal habeas court simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable."). When the relevant state-court decision is not accompanied with reasons for the decision, the federal court "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale [and] presume that the unexplained decision adopted the same reasoning." *Wilson*, 138 S. Ct. at 1192. The State may contest "the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision . . . ." *Wilson*, 138 S. Ct. at 1192.

In a *per curiam* decision without a written opinion the state appellate court on direct appeal affirmed Harrison's convictions and sentence. (Respondent's Exhibit 4) Similarly, in another *per curiam* decision without a written opinion the state appellate court affirmed the denial of Harrison's Rule 3.850 motion for post-conviction relief. (Respondent's Exhibit 11) A state appellate court's *per curiam* decision warrants deference under Section 2254(d)(1) because "the summary nature of a state court's decision does not lessen the deference that it is due." *Wright v. Moore*, 278 F.3d 1245, 1254, *reh'g and reh'g en banc denied*, 278 F.3d 1245 (11th Cir. 2002), *cert. denied sub nom*

*Wright v. Crosby*, 538 U.S. 906 (2003); *Richter*, 562 U.S. at 100 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."); *Bishop v. Warden*, 726 F. 3d 1243, 1255–56 (11th Cir. 2013) (describing the difference between an "opinion" or "analysis" and a "decision" or "ruling" and explaining that deference is accorded the state court's "decision" or "ruling" even absent an "opinion" or "analysis").

As *Pinholster* explains, 563 U.S. at 181–82, review of the state court decision is limited to the state court record:

> We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. Section 2254(d)(1) refers, in the past tense, to a state-court adjudication that "resulted in" a decision that was contrary to, or "involved" an unreasonable application of, established law. This backward-looking language requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at that same time, i.e., the record before the state court.

Harrison bears the burden of overcoming by clear and convincing evidence a state court's fact determination. "[A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). This presumption of correctness applies to a finding of fact but not to a mixed determination of law and fact. *Parker v. Head*, 244 F.3d 831, 836 (11th Cir.), *cert. denied*, 534 U.S. 1046 (2001). The state court's rejection of

Harrison's claims warrants deference in this federal action.  (Order Denying Motion to Suppress, Respondent's Exhibit 14, Vol. II at 232–38); (Oral Ruling Denying Motion to Confront Witness, *Id.* at Vol. VIII at 440–41); (Oral Ruling Denying Motion for Witness Testimony, *Id.*, Vol. IX at 726–27); (Order Denying Motion for Post-Conviction Relief, Respondent's Exhibit 7)  Harrison's federal application presents the same grounds that he presented to the state courts.

## IV.  ISSUES ON DIRECT APPEAL

### Ground One:

Harrison asserts that, by denying his motion to suppress his confession, the trial court violated both his right against self-incrimination and his right to counsel. (Doc. 1 at 5)  The trial court denied the motion to suppress in a written order with findings of fact and conclusions of law.  (Respondent's Exhibit 14, Vol. II at 232–38)

### 1.    Facts

The trial court found the following (Respondent's Exhibit 14, Vol. II at 232–35) (en-dashes in the original):

> At the hearing on this motion, Detective Ken Halpin of the Sarasota Police Department testified first on behalf of the State. Detective Halpin's testimony is summarized as follows:
>
> –  Detectives Halpin and Grant were dispatched to I.K.'s middle school on March 4, 2011, after I.K. told school officials that the Defendant was sexually molesting him.
>
> –  When the two detectives first got to the school, they went to the assistant principal's office. I.K. was sitting in an outer office. In addition to the assistant principal, the school resource officer and a DCF investigator were also present.

– A few minutes later, the Defendant also arrived at the school. When detectives first saw the Defendant, he was talking to I.K.

– The detectives learned that the Defendant came to the school because I.K. was acting out and other students had complained about his conduct.

– The detectives borrowed a conference room. Detective Grant remained with the Defendant in the conference room while Detective Halpin spoke to the assistant principal to get information about I.K.'s allegations.

– Detective Halpin learned that I.K. alleged that the Defendant was inappropriately touching him.

– Detective Halpin returned to the conference room and told the Defendant that I.K. had made a complaint against him and that he thought [that] it was more appropriate to discuss the complaint at the police department instead of the school. Detective Halpin asked the Defendant to drive to the police department.

– The Defendant appeared "surprised" when he learned that the complaint was about him touching I.K. and that the detectives had responded to the school to investigate that complaint.

– The Defendant agreed to talk to the detectives at the police department and drove his own car directly from the school to the police department. The detectives drove separately.

– At the police department, Detective Halpin met the Defendant in the first floor lobby and escorted him to an interview suite on the fourth floor. The interview suite requires a card key to enter and has several interview rooms, a common area[,] and a bathroom.

– At first, while the Defendant sat alone in the interview room, Detective Halpin unsuccessfully

tried to have I.K. place a controlled call to the Defendant's cell phone.

– Throughout the interview, the door to the room remained propped open with a chair. The Defendant kept all of his personal belongings including his cell phone and car keys. Both detectives were dressed in plain clothes and did not have any weapons or handcuffs.

– During the initial interview, the Defendant was free to use the bathroom, which he did.

– The Defendant denied sexually abusing I.K.

– The Defendant agreed to take a polygraph exam.

– At the end of the first interview, Detectives Grant and Halpin walked the Defendant across the street to the Sarasota County Sheriff's Office, where Sergeant Pingel gave the Defendant a polygraph exam.

– Detectives Halpin and Grant watched the polygraph exam from a computer monitor.

– After the Defendant made admissions to Sergeant Pingel, Detectives Halpin and Grant conducted a second interview of the Defendant in an interview room at the sheriff's office. During that interview, the Defendant admitted that he had sexually molested I.K.

At the hearing on this motion, Detective David Grant of the Sarasota Police Department testified second on behalf of the State. Detective Grant's testimony was consistent with Detective Halpin's testimony.

At the hearing on this motion, Sergeant Kevin Pingel of the Sarasota County Sheriff's Office testified third on behalf of the State. Prior to the polygraph exam, Sergeant Pingel asked the Defendant to review and sign a pre-printed *Miranda* waiver. The Defendant signed the form and consented to the test. Sergeant Pingel administered the test, reviewed the results in the Defendant's presence[,] and then told the Defendant that he was deceptive. Sergeant Pingel described the manner in which he administered the polygraph test and interpreted its results.

2.  <u>**Analysis**</u>

*Miranda v. Arizona*, 384 U.S. 436 (1966), holds that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda*, 384 U.S. at 444. Before any questioning, the defendant must be informed that he has the right to remain silent, his statement can be used as evidence against him, and he has the right to have a retained or appointed attorney present. *Miranda*, 384 U.S. at 444–45. "Custodial interrogation" means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444. If the defendant indicates that either he wants to consult an attorney or that he does not want to participate in an interrogation, police may not question him. *Miranda*, 384 U.S. at 444–45.

<u>**Claim One**</u>

First, Harrison asserts that the detectives took him into custody, interrogated him, and did not read him his *Miranda* rights. The state court denied this claim as follows (Respondent's Exhibit 14, Vol. II at 235–36):

> The Defense initially argues that Detectives Grant and Halpin failed to read the Defendant his *Miranda* rights. The Defense asserts that while the Defendant voluntarily drove from the school to the police department and agreed to speak with the detectives, at some point his initial interview became custodial. The Court finds insufficient evidence to support this argument. When the Defendant first met Detectives Grant and Halpin at the school, they told him — and he was aware — that I.K. had accused him of some kind of inappropriate touching. The

Defendant voluntarily agreed to drive from the school to the police department in his own car to talk about the allegations. At the police department, Detective Halpin escorted the Defendant to an interview suite that required a key card for entry, though all other rooms in the suite remained unlocked. The digital recording of the Defendant's interview shows that the door to the interview room remained open at all times. The Defendant always had his car keys and cell phone. The Defendant was freely allowed to use the restroom, which he did. Both detectives dressed in plain clothes and did not carry or display any weapons or handcuffs. The tone throughout the entire initial interview was conversational without any raised voices or negative overtones. The initial interview took place during the day and was less than an hour and a half. While the allegations were grave and serious, there is no evidence to suggest that the interview between the Defendant and the detectives ever became custodial in nature. Throughout the initial interview, the detectives tell the Defendant that he is speaking to them voluntarily and that he is free to leave. The Defendant either acknowledge[d] those statements or said nothing to negate those statements. No other issues regarding the Defendant's *Miranda* [r]ights are at issue. Prior to the polygraph examination, the Defendant reviewed and signed a *Miranda* Waiver of Rights form, which was introduced at the hearing on this motion.

To determine whether a defendant is in custody, *Thompson v. Keohane*, 516 U.S. 99, 112 (1995) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)) explains:

Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve "the ultimate inquiry:" "[was] there a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest."

Testimony at the suppression hearing supports the state court's findings.

(Respondent's Exhibit 14, Vol. IV at 451, 455–57, 478, 479)  The detectives also

reminded Harrison that he came "on [his] own free will," told him that he was "certainly free to go," and offered to walk him downstairs to leave.  (Respondent's Exhibit 14, Vol. IV at 582, 597, 604–06)  Because Harrison followed the detectives to the police station in his own car, the detectives interviewed Harrison in a room with the door open, and the detectives repeatedly reminded Harrison that he could leave, the detectives did not restrain Harrison's freedom of movement "of the degree associated with a formal arrest."  *Thompson*, 516 U.S. at 112.

Harrison signed a *Miranda* waiver before the polygraph test.  (Respondent's Exhibit 14, Vol. II at 265–66 and Vol. IV at 508–12)  His waiver of his constitutional rights extended to the interrogation after the test.  *Wyrick v. Fields*, 459 U.S. 42, 47 (1982) (holding that a defendant's *Miranda* waiver before a polygraph examination extended to interrogation by the examiner after the examination); *Jarrell v. Balcom*, 735 F.2d 1242, 1253–54 (11th Cir. 1984) ("Under the circumstances of this case, we do not view a confession given less than four hours after the issuance of *Miranda* warnings inadmissible because of the failure to reissue the warnings . . . .  The record reflects that the warnings given were complete and that Jarrell understood them.").

## Claim Two

Second, Harrison asserts that he asked the detectives for an attorney, and the detectives did not terminate the interrogation.  The state court denied this claim as follows (Respondent's Exhibit 14, Vol. II at 236–37):

> The Defense next asserts that the detectives ignored the Defendant's requests for an attorney by failing to properly address his requests or stop the interview. About forty minutes

into the unredacted interview, the following exchange takes place between the Defendant and the detectives:

| | |
|---|---|
| Defendant: | And I guess maybe I need a lawyer. I don't know [be]cause I'm, I don't know what I'm saying. |
| Detective [#1]: | Well, only you can decide that part. |
| Defendant: | Oh God. |
| Detective [#1]: | We're just trying to find out what happened. Do you need a minute? |
| Defendant: | I just, not really. |
| Detective [#1]: | Okay. I'm just asking. |
| Defendant: | I don't, I don't. |
| Detective [#1]: | Looks like you're trying to figure stuff out. I don't want to — |
| Defendant: | I'm trying to wrap my brain around what is going on here. Why we're here and [I.K.] was brought to the school because [I.K.] has exposed [himself] to some girl and she took a picture. |

At one hour and sixteen minutes, the following exchange takes place between the Defendant and the detectives in relation to whether the Defendant wants to take a polygraph test:

| | |
|---|---|
| Defendant: | I, I feel like I need a lawyer, [be]cause I know this is [going to] get out of control. |
| Detective [#2]: | Okay. |
| Defendant: | This is [going to] get out of control. |
| Detective [#1]: | Alright. |
| Detective [#2]: | That's your choice. |
| Detective [#1]: | I think you just made the call. |

- 15 -

| | |
|---|---|
| Defendant: | I don't know what to do. I don't know what to do. I just want to go home with my son and have a good weekend. |
| Detective [#2]: | Right. |
| Detective [#1]: | Well, the Department of Children and Families will get back to you about your son, but as for you, certainly, you're free to go. |
| Detective [#2]: | Yeah. I'll walk you downstairs. |
| Defendant: | What do we need to do? What do we need to do? |
| Detective [#2]: | As far as what? |
| Defendant: | [Because] this isn't [going to] be over tonight. I can tell you that already. |
| Detective [#2]: | Well, not, it's, I mean, it's probably not [going to] be settled tonight. No doubt. But you, when you throw the lawyer word out, we're pretty much obligated to be done with you. |
| Defendant: | I just, I don't know what to do. |
| Detective [#2]: | Well, I understand that. |
| Defendant: | I'm scared. |

The Court finds that in both instances where the Defendant refers to a lawyer, it was not unequivocal. In each instance, the detectives stopped their questioning and told the Defendant that obtaining a lawyer was his choice. The first time, the detectives asked the Defendant if he needed to think about whether he needed an attorney and he declined their offer and changed the topic of conversation. The second time, the Defendant verbally and physically reinitiated the interview after the detectives started to physically leave the interview room. Afterward, the Defendant asked what he needed to do to address the allegations. In both instances, when the Defendant referred to hiring a lawyer, the detectives' responses were appropriate under applicable case law and there was no need to terminate the interview because the Defendant made no

unequivocal request for a lawyer. *State v. Glatzmayer*, 789 So. 2d
297 (Fla. 2001).

The state court accurately quoted the initial interview.  (Respondent's
Exhibit 14, Vol. IV at 581, 604–05)  Because the detectives did not take Harrison
into custody during the initial interrogation, *Miranda* did not apply.  *Tukes v.
Dugger*, 911 F.2d 508, 515 (11th Cir. 1990) ("Where the prisoner is not in custody,
the *Edwards* and *Roberson* concerns are not triggered because the non-custodial
defendant is free to refuse to answer police questions, free to leave the police station
and go home, and free to seek out and consult a lawyer.").

Even if *Miranda* did apply, the detectives did not have to terminate the
interrogation because Harrison's requests for an attorney were ambiguous and
equivocal.  *Davis v. United States*, 512 U.S. 452, 459 (1994) ("But if a suspect makes
a reference to an attorney that is ambiguous or equivocal in that a reasonable officer
in light of the circumstances would have understood only that the suspect might
be invoking the right to counsel, our precedents do not require the cessation of
questioning.").  After the second equivocal request for an attorney, Harrison initiated
further communication, which allowed the detectives to further question him.
*Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981) ("We further hold that an accused,
such as Edwards, having expressed his desire to deal with the police only through
counsel, is not subject to further interrogation by the authorities until counsel has
been made available to him, unless the accused himself initiates further
communication, exchanges, or conversations with the police.").

**Claim Three**

Lastly, Harrison asserts that the officers' interrogation techniques unlawfully coerced him into confessing.  The state court denied this claim as follows (Respondent's Exhibit 14, Vol. II at 237–38):

> Finally, the Defense asserts that detectives used [ ] coercive and manipulative techniques to obtain admissions from the Defendant. In particular, the Defense asserts that the manner in which Sergeant Pingel administered the polygraph exam was incorrect and misleading. The Court finds that even if Sergeant Pingel either negligently or purposefully administered the polygraph exam to reflect deception by the Defendant that did not truly exist, that would not rise [to] the level of rendering the Defendant's admissions involuntary or otherwise inadmissible. The Court declines to make any findings as to whether the manner in which the polygraph exam was conducted was scientifically appropriate [because] the exam was not mentally or physically coercive. The Court does not find that the questioning techniques used by either Detectives Grant and Halpin or Sergeant Pingel were inappropriate or that they rose to the level of rendering the Defendant's admissions involuntary and inadmissible. Throughout all of the interviews, there was a consistent low-key, non-threatening tone employed by all law enforcement officers that appears to have encouraged the Defendant to voluntarily participate in the interviews, despite the gravity of the allegations he was facing.

Before the polygraph test, Harrison signed a *Miranda* waiver form and a consent form for the test.  (Respondent's Exhibit 14, Vol. II at 230–31)  Even if Sergeant Pingel misled Harrison about the results of the test, the sergeant did not unlawfully coerce Harrison with the test.  *Fields*, 459 U.S. at 47; *United States v. Farley*, 607 F.3d 1294, 1328–29 (11th Cir. 2010) ("Misleading a suspect about the existence or strength of evidence against him does not by itself make a statement involuntary.  By contrast, statements have been held involuntary where the deception took the form of a coercive threat . . . .") (citations omitted); *United States v. Haswood*,

350 F.3d 1024, 1029 (9th Cir. 2003) ("The use of polygraph results is a reasonable means of police questioning.  Even misrepresentations by law enforcement, while reprehensible, do not necessarily evidence coercive conduct.") (citations omitted).

* * * *

The detectives complied with the federal constitution and, consequently, the state court did not unreasonably apply *Miranda*.  *Yarborough v. Alvarado*, 541 U.S. 652, 665 (2004) ("These differing indications lead us to hold that the state court's application of our custody standard was reasonable. . . . We cannot grant relief under AEDPA by conducting our own independent inquiry into whether the state court was correct as a *de novo* matter."); *Land v. Allen*, 573 F.3d 1211, 1217 (11th Cir. 2009) (requiring a federal habeas court to "independently ascertain and apply Federal law to determine whether the challenged statement was obtained in accordance with the Constitution").

**Ground Two:**

Harrison asserts that the trial court denied both his right to cross-examine witnesses ("sub-claim A") and his right to present witnesses ("sub-claim B").  (Doc. 1 at 7)  Harrison contends that the trial court prevented his offering evidence to support his defense that I.K. raped him.  (Doc. 1 at 7)

### Sub-claim A — Right to Cross-Examine Witnesses

Trial counsel sought to cross-examine I.K. about his sexually aggressive behavior at school.  (Respondent's Exhibit 14, Vol. VIII at 428–32)  During a proffer, I.K. testified that female students had accused him of sexually aggressive behavior

but I.K. denied the accusations.  (Respondent's Exhibit 14, Vol. VIII at 434–37)

The trial court orally denied trial counsel's request for cross-examination as follows

(Respondent's Exhibit 14, Vol. VIII at 440–41):

| | |
|---|---|
| Court: | As to March 4th, the parties have told the Court that you're in agreement [ ] that [the] evidence should be presented, so I'm not going to make any rulings or insert myself. |
| | As to events or allegations that arose at school with regard to the victim's conduct at school prior to March 4th, I'll maintain the Court's ruling on the motion *in limine* prior to trial that those acts would not be admissible at this point. I don't think that there has been a sufficient proffer to the Court to admit these either as a kind of reverse *Williams* Rule or relevant — otherwise relevant character evidence. I don't believe at this point that they are relevant to support [ ] a defense at this point that the anal penetration of the defendant's anus by the victim was [non]consensual by the defendant. |
| . . . . | |
| Counsel: | Your Honor, what about the Court's ruling with regard to motive and bias? |
| Court: | Again, I don't think it's relevant as to motive and bias. You can ask him generic questions: Were you afraid of getting in trouble? Did they accuse you of committing crimes that you could be prosecuted in juvenile court for? That [you can] do, but I don't think the prior acts are going to be admissible to that. So you'll still be able to establish a credibility issue [ ] — |
| . . . . | |
| Counsel: | Your Honor, I think that — I think I need to explore this issue with I.K. regarding the matter of what he meant when he said he was too young to be taught how to put on a condom. |
| . . . . | |

| | |
|---|---|
| Court: | How do you want to explore his position that he was too young to put on the condom? |
| Counsel: | I just wanted to ask what he meant about that. He doesn't know about that. He's saying he never experienced that. He doesn't have — |
| Court: | Okay. Having an erection and putting on a condom? |
| Counsel: | He's sexually inexperienced. Is that what he's claiming? |
| Court: | Alright. State? |
| Prosecutor: | That's just going to bring up a whole bag of tricks. I mean, he's going to go into, yeah, I've had an erection and go into — possibly, open[ing] up everything the Court just ruled on not allowing to come in. |
| Court: | [Trial counsel] can cross-examine him on that. It came out in your direct when you asked him about it so — the experience and why he wasn't experienced enough. I don't see how it brings in the school episodes at this point because, again, they're not — at this point, I haven't had any witnesses presented to me. I don't have anything else. He's denying that these allegations were made against him. |
| . . . . | |
| Counsel: | But he's saying the allegations were made against him. |
| Court: | Sure, he's saying the allegations were made but he's also denying them. So if you want to use it as reverse *Williams* rule, I can't get there at this point. |
| Counsel: | We want to use it right now for him to go into his motives right now. If he wants to deny doing it, that's fine. We have witnesses. |

Court:   That is inappropriate impeachment and character
      evidence. You're certainly free to ask him about
      all the issues he has with regard to putting on a
      condom at the age he was allegedly asked to do
      so. It's up to you if you want to follow up on it.

Counsel:  Your Honor, I just want to let the Court
      know that this is completely cut[ting] our defense
      off at the knees. Right now what I can get into
      with him is only going to let the jury believe that
      he is — that this was a one[-]time situation on
      March 4, 2011 and that it was the product of
      some sort of abuse. That is what they're going to
      be left with.

Court:   The Court's ruling is going to stand . . . .

Whether evidence of the prior acts was admissible on cross-examination is an issue of state law, and a state court's determination of state law receives deference in federal courts. *Machin v. Wainwright*, 758 F.2d 1431, 1433 (11th Cir. 1985) ("The federal courts must defer to a state court's interpretation of its own rules of evidence and procedure."). Under state law, "the defendant may not use cross-examination as a vehicle for presenting defensive evidence." *Steinhorst v. State*, 412 So. 2d 332, 337 (Fla. 1982). *Accord Nevada v. Jackson*, 569 U.S. 505, 512 (2013) ("[T]his Court has never held that the Confrontation Clause entitles a criminal defendant to introduce extrinsic evidence for impeachment purposes.").

The Confrontation Clause of the Sixth Amendment guarantees the defendant's right to confront witnesses against him. *Delaware v. Van Arsdall*, 475 U.S. 673, 678–79 (1986) (citations and quotations omitted) explains:

Of particular relevance here, we have recognized that the
exposure of a witness'[s] motivation in testifying is a proper
and important function of the constitutionally protected right
of cross-examination. It does not follow, of course, that the

> Confrontation Clause of the Sixth Amendment prevents a
> trial judge from imposing any limits on defense counsel's
> inquiry into the potential bias of a prosecution witness. On
> the contrary, trial judges retain wide latitude insofar as the
> Confrontation Clause is concerned to impose reasonable limits
> on such cross-examination based on concerns about, among
> other things, harassment, prejudice, confusion of the issues,
> the witness'[s] safety, or interrogation that is repetitive or only
> marginally relevant. And as we observed earlier this Term, the
> Confrontation Clause guarantees an opportunity for effective
> cross-examination, not cross-examination that is effective in
> whatever way, and to whatever extent, the defense might wish.

Trial counsel cross-examined I.K. about motive.  I.K. testified that a female student accused him of exposing his penis and forcing her to touch his penis.  An assistant principal and a school resource officer confronted I.K. with the accusation.  I.K. denied the accusation twice.  The assistant principal and the school resource officer threatened I.K. with juvenile punishment.  I.K. feared the punishment and admitted the accusation.  I.K. told the assistant principal about Harrison's sexual abuse after the assistant principal confronted him with the female student's accusation.  (Respondent's Exhibit 14, Vol. VIII at 447–48, 450, 454–56, 479) The jury could have inferred that I.K. accused Harrison of sexual abuse to avoid punishment at school.  Because the state court did not categorically exclude cross-examination about motive, the state court did not unreasonably apply *Van Arsdall*. *De Lisi v. Crosby*, 402 F.3d 1294, 1303 (11th Cir. 2005).

### Sub-claim B — Right to Present Witnesses

Trial counsel sought to present three witnesses to testify about I.K.'s sexually aggressive behavior at school. The trial court orally denied the request as follows (Respondent's Exhibit 14, Vol. IX at 723–27):

Counsel:      The three witnesses in question we may call . . .
              are: Ilene Ruiz, and she would testify that
              in February of 2010, [I.K.] was constantly hugging
              her and trying to grab on to her breasts and she
              would tell him to stop, and then he would say, no
              — okay, I won't do it, I'm just going to hug you,
              and then he would do it again and try to touch
              her some more, and it was almost the way — it
              would almost be like a bargaining session where
              he would say, I'm just going to hug you, that's all
              I'm going to do. And then he would also go
              further and he wouldn't stop.

              Then with regard to Mia Miller, she would testify
              that in November of 2010, she saw [I.K.] touch
              another girl on her butt[ocks] and the indication
              would be that — oh, excuse me. Ms. Ruiz would
              say that [I.K.] would — he touched other girls
              like this and one of the girls was a girl named
              Mia, and Mia Miller would testify that she has
              seen [I.K.] touch other girls in a lewd manner.

              Christina Johnson — I'm sorry. Melissa Roberts.
              Christina Johnson is her mother. I believe if she
              was called, based on her written report to the
              school, that she would testify that November 16,
              2010, that [I.K.] was always touching girls. They
              would tell them to stop, and he would go up
              behind them and he would do lewd things to
              them. That is my position that the cumulative
              fact of this testimony be that [I.K.] is touching
              girls at school against their will.

Court:        In terms of the legal argument, what is the basis
              for admitting it?

Counsel:      I think if the Court were to admit this at this
              point, it would only — it would have to be based
              on a showing that [I.K.] — it would be based on
              — the relevancy would be that [I.K.] is sexually
              aggressive and attempts to touch people or does
              touch people in a sexually aggressive manner
              against their will, that it was not consensual
              touching, and that would support Mr. Harrison's
              statement to the police, that he was raped.

              . . . .

Court:   I don't find that the proffered testimony of Ms. Ruiz, [Ms.] Miller, and [Ms.] Roberts would be sufficiently relevant or probative and might be more prejudicial than probative if allowed in.

First, in terms of using their testimony to establish, one, that [I.K.] acted out sexually, if this were to be a reverse *Williams* Rule coupled with what is ultimately a reflection of the sexual conduct of the alleged victim in this case, which is the two of them going together, [it] is not your typical *Williams* Rule, reverse *Williams* Rule, but even looking at his aggression *per* [*se*], without looking at some of the more details, I don't find that it is sufficiently related or relevant to the issue of whether or not he physically attacked and handcuffed and then sodomized Mr. Harrison compared to incidences at school where he touched female classmates in what appeared to be incidence[s] that are different in nature in terms of victims, the ages, the manner in which the act is carried out, the duration of the act, [and] the violent nature of the act. I can't find that they're sufficiently relevant to be admissible to establish that [I.K.] had an aggressive, violent, or [ ] any component suggesting aggression [as] part of his personality where he would act out sexually.

I also think that the events would be improper character evidence with regard to the victim of sex abuse in this case. I'm not finding — I'm not as concerned with that as I am with whether or not there is proper similarity or identity between the supposed events and that sometimes there can be a comment on a victim's character where it would be admissible to help establish a defense.

Whether the testimony was admissible under state rules of evidence is an issue of state law, and a state court's determination of state law receives deference in federal courts. *Machin*, 758 F.2d at 1433. The Fifth Amendment and Sixth Amendment guarantee a defendant the right to present witnesses that are "both

material and favorable to his defense." *United States v. Valenzuela-Bernal*,

458 U.S. 858, 867 (1982).  Evidence is material "'only if there is a reasonable

likelihood that the testimony could have affected the judgment of the trier of fact.'"

*Taylor v. Singletary*, 122 F.3d 1390, 1394–95 (11th Cir. 1997) (quoting

*Valenzuela-Bernal*, 458 U.S. at 874).  A defendant must show "'the evidence

unavailable at trial could [have] reasonably be[en] taken to put the whole case in

such a different light as to undermine confidence in the verdict.'"  *Taylor*, 122 F.3d

at 1394–95 (quoting *Kyles v. Whitley*, 514 U.S. 419, 434–35 (1995)).

 The proffered testimony by the excluded witnesses did not support Harrison's

defense.  The defense involved sexually aggressive behavior by a minor male on an

adult male legal guardian; the proffered testimony involved sexually aggressive

behavior by a minor male on minor females.  The defense involved a physical attack

with handcuffs, choking, and anal penetration; the proffered testimony involved

unwanted touching on the breasts and buttocks.  The defense involved conduct

that occurred in the family home; the proffered testimony involved conduct that

occurred in school.  Because the proffered testimony did not prove that I.K.

physically attacked and raped Harrison at home and would not have put the whole

case in such a different light as to undermine confidence in the verdict, the state court

did not unreasonably apply clearly established federal law.  *De Lisi*, 402 F.3d at 1303;

*United States v. De La Cruz Suarez*, 601 F.3d 1202, 1213 (11th Cir. 2010).

## V.  INEFFECTIVE ASSISTANCE OF COUNSEL

Harrison claims ineffective assistance of counsel, a difficult claim to sustain. "[T]he cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between."  *Waters v. Thomas*, 46 F.3d 1506, 1511 (11th Cir. 1995) (*en banc*) (quoting *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994)).  *Sims v. Singletary*, 155 F.3d 1297, 1305 (11th Cir. 1998), explains that *Strickland v. Washington*, 466 U.S. 668, 687 (1984), governs an ineffective assistance of counsel claim:

> The law regarding ineffective assistance of counsel claims is well settled and well documented. In *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the Supreme Court set forth a two-part test for analyzing ineffective assistance of counsel claims. According to *Strickland*,
>
>> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland* requires proof of both deficient performance and consequent prejudice.  *Strickland*, 466 U.S. at 697 ("There is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one."); *Sims*, 155 F.3d at 1305 ("When applying *Strickland*, we are free to dispose of ineffectiveness claims on either of its two grounds.").  "[C]ounsel is strongly presumed to have rendered adequate

assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." 466 U.S. at 690. *Strickland* requires that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." 466 U.S. at 690.

Harrison must demonstrate that counsel's alleged error prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." 466 U.S. at 691. To meet this burden, Harrison must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694.

*Strickland* cautions that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." 466 U.S. at 690–91. As *White v. Singletary*, 972 F.2d 1218, 1220–21 (11th Cir. 1992), explains, Harrison cannot meet his burden merely by showing that the avenue chosen by counsel proved unsuccessful.

> The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would

> have done. We ask only whether some reasonable lawyer at the
> trial could have acted, in the circumstances, as defense counsel
> acted at trial . . . . We are not interested in grading lawyers'
> performances; we are interested in whether the adversarial
> process at trial, in fact, worked adequately.

*Accord Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) ("To state

the obvious:  the trial lawyers, in every case, could have done something more or

something different.  So, omissions are inevitable . . . .  [T]he issue is not what is

possible or 'what is prudent or appropriate, but only what is constitutionally

compelled.'") (*en banc*) (quoting *Burger v. Kemp*, 483 U.S. 776, 794 (1987)).

Additionally, *Hittson v. GDCP Warden*, 759 F.3d 1210, 1267 (11th Cir. 2014),

*cert. denied sub nom., Hittson v. Chatman*, 135 S. Ct. 2126 (2015), discusses the required

extent of counsel's investigation:

> [W]e have explained that "no absolute duty exists to
> investigate particular facts or a certain line of defense."
> *Chandler*, 218 F.3d at 1317. "[C]ounsel has a duty to make
> reasonable investigations or make a reasonable decision
> that makes particular investigations unnecessary." *Strickland*,
> 466 U.S. at 691, 104 S. Ct. at 2066 (emphasis added).
> "[C]ounsel need not always investigate before pursuing or not
> pursuing a line of defense. Investigation (even a nonexhaustive,
> preliminary investigation) is not required for counsel reasonably
> to decline to investigate a line of defense thoroughly." *Chandler*,
> 218 F.3d at 1318. "In assessing the reasonableness of an
> attorney's investigation . . . a court must consider not only
> the quantum of evidence already known to counsel, but also
> whether the known evidence would lead a reasonable attorney
> to investigate further." *Wiggins*, 539 U.S. at 527, 123 S. Ct. at
> 2538.

*See also Jones v. Barnes*, 463 U.S. 745, 751 (1983) (confirming that counsel has no duty

to raise a frivolous claim).

Under Section 2254(d) Harrison must prove that the state court's decision "(1) [was] contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States or (2) [was] based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  Sustaining a claim of ineffective assistance of counsel is very difficult because "[t]he standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105; *Pinholster*, 563 U.S. at 202 (stating that an applicant to overcome this "'doubly deferential' standard of *Strickland* and the AEDPA"); *Nance v. Warden, Ga. Diag. Prison*, 922 F.3d 1298, 1303 (11th Cir. 2019) ("Given the double deference due, it is a 'rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding.'") (quoting *Johnson v. Sec'y, Dep't of Corr.*, 643 F.3d 907, 911 (11th Cir. 2011)), *cert. denied*, 140 S. Ct. 2520 (2020); *Pooler v. Sec'y, Dep't of Corr.*, 702 F.3d 1252, 1270 (11th Cir. 2012) ("Because we must view Pooler's ineffective counsel claim — which is governed by the deferential *Strickland* test — through the lens of AEDPA deference, the resulting standard of review is "doubly deferential."), *cert. denied*, 571 U.S. 874 (2013).

In summarily denying Harrison's motion for post-conviction relief, the state court recognized that *Strickland* governs a claim of ineffective assistance of counsel. (Respondent's Exhibit 7 at 2)  Because the state court rejected the grounds based on *Strickland*, Harrison cannot meet the "contrary to" test in Section 2254(d)(1).

Harrison instead must show that the state court unreasonably applied *Strickland* or unreasonably determined the facts.  In determining "reasonableness," a federal application for the writ of habeas corpus authorizes determining only "whether the state habeas court was objectively reasonable in its *Strickland* inquiry" and not independently assessing whether counsel's actions were reasonable.  *Putnam v. Head*, 268 F.3d 1223, 1244, n.17 (11th Cir. 2001), *cert. denied*, 537 U.S. 870 (2002).  The presumption of correctness and the highly deferential standard of review requires that the analysis of each ground begin with the state court's analysis.

## A.  Grounds of IAC During Pre-Trial

**Ground Three:**

Harrison asserts that trial counsel was ineffective for not filing a motion to dismiss count five in the information.  The post-conviction court denied the claim as follows (Respondent's Exhibit 7 at 3) (state court record citations omitted):

> . . . Defendant alleges ineffective assistance of counsel for failing to file a pretrial motion to dismiss Count Five of the Information. Specifically, he asserts that Count Five was charged based upon his admission to law enforcement that the victim forced himself on Defendant without [ ] consent and anally penetrated him. He argues that counsel should have moved to dismiss this charge because, apart from his admission, there was no independent proof that the crime occurred.
>
> This claim is without merit. A defendant's confession to a crime cannot form the sole basis for that defendant's conviction for that crime; there must be *prima facie* evidence of the crime charged — the *corpus delicti* — independent of the defendant's confession. *See Burks v. State*, 613 So. 2d 441, 443, 444 (Fla. 1993); *Johnson v. State*, 569 So. 2d 872, 873 (Fla. 2d DCA 1990). *Corpus delicti* has been defined as "'the fact that a crime has actually been committed, that someone is criminally responsible.'" *Burks*, 613 So. 2d at 443 (quoting *Ballentine's Law*

*Dictionary* 276 (3d ed. 1969)) (footnote omitted). The state is charged with the burden of proving by substantial evidence that a crime has been committed and such proof may be in the form of circumstantial evidence. *See Burks*, 613 So. 2d at 443.

Count Five of the fifth amended Information alleges "I.K. . . . with his penis, penetrated or had union with the anus of Joe Harrison . . . ." While it appears this charge was brought against Defendant based only on his confession to the crime, a motion to dismiss would have been unsuccessful. At trial, I.K. testified regarding this incident:

| | |
|---|---|
| The State: | At any point when you were living at the Four Seasons apartment and during your seventh grade here at Booker Middle School, did you ever have — did the defendant ever ask you to put your penis inside of him? |

. . . .

| | |
|---|---|
| I.K.: | Yes. |
| The State: | Can you describe to the jury how that happened, what occurred? |
| I.K.: | I was in the living room — no. I was in my room playing my video game. He comes in the room and says I want to teach you how to put a condom on. When he told me that, I said, ["]No, I'm too young, I want to learn, like, when I'm 16 or 15. It's too early to learn that.["] He says[, "]I don't care.["] So he pulls down my pants telling me to put the condom on, teach[ing] me how to put it on. Then he tells me to put my penis inside his anus and pretty much he just told me to keep going inside his anus. |
| The State: | Did you — when he told you to keep going, did you end up ejaculating? |
| I.K.: | Yes. |

Had counsel moved to dismiss Count Five, the State would have alleged those facts set forth above in a traverse[,] which would have been sufficient to withstand a motion to dismiss. *See Burks*, 613 So. 2d [at] 441. As counsel would not have ultimately been successful on a motion to dismiss on this basis,

- 32 -

he cannot be found ineffective for failing to file one.
*See Dennis v. State*, 109 So. 3d 680, 693 (Fla. 2012) (counsel
cannot be deemed ineffective for failing to raise a meritless
issue); *Teffeteller v. Dugger*, 734 So. 2d 1009, 1019–20 (Fla. 1999)
(explaining counsel cannot be deemed ineffective for failing to
prevail on a meritless issue); *King v. Dugger*, 555 So. 2d 355,
357–58 (Fla. 1990) (explaining the failure to raise a
non-meritorious issue is not ineffectiveness).

The state court both accurately described count five in the information and

accurately quoted I.K.'s testimony at trial.  (Respondent's Exhibit 7, Attachment 1

at 3 and Attachment 4 at 425)  Whether I.K.'s testimony independently established

the *corpus delicti* is an issue of state law, and a state court's determination of state

law receives deference in a federal court.  *Pinkney v. Sec'y, Dep't Corrs.*, 876 F.3d 1290,

1295 (11th Cir. 2017) ("And although the issue of ineffective assistance — even

when based on the failure of counsel to raise a state law claim — is one of

constitutional dimension, we must defer to the state's construction of its own law

when the validity of the claim that [ ] counsel failed to raise turns on state law.")

(citations and quotations omitted).  I.K.'s testimony directly proved the crimes and

established the *corpus delicti*.  *Ramirez v. State*, 133 So. 3d 648, 652 (Fla. 1st DCA

2014).  Because the motion to dismiss would not have succeeded, trial counsel was

not ineffective.  *Pinkney*, 876 F.3d at 1297 ("[A]n attorney will not be held to have

performed deficiently for failing to perform a futile act, one that would not have

gotten his client any relief.").  Consequently, the state court did not unreasonably

apply *Strickland*.

**Ground Four:**

Harrison asserts that trial counsel was ineffective for not filing a motion for a statement of particulars and a motion *in limine* to exclude other uncharged crimes. (Doc. 1 at 10)  The post-conviction court denied the claim as follows (Respondent's Exhibit 7 at 4–5) (state record citations omitted) (brackets in the original):

> . . . Defendant alleges ineffective assistance of counsel for failing to file a motion for statement of particulars and a motion *in limine* to prevent the State from suggesting and arguing that he confessed to any of the alleged crimes that occurred in 2011. Specifically, Defendant alleges the crimes the State charged him with allegedly occurred between July 1, 2009, and March 4, 2011. He contends the State should have narrowed the time frame in order for Defendant to sufficiently prepare a defense. Defendant also argues that counsel should have moved to suppress Defendant's statements to law enforcement.
>
> This claim is without merit. Florida Rule of Criminal Procedure 3.140(o) provides:
>
> > (o) Defects and Variances.  No indictment or information, or any count thereof, shall be dismissed or judgment arrested, or new trial granted on account of any defect in the form of the indictment or information or of misjoinder of offenses or for any cause whatsoever, unless the court shall be of the opinion that the indictment or information is so vague, indistinct, and indefinite as to mislead the accused and embarrass him or her in the preparation of a defense or expose the accused after conviction or acquittal to substantial danger of a new prosecution for the same offense.
>
> In *Tingley v. State*, 549 So. 2d 649, 651 (Fla. 1989), the Florida Supreme Court noted that the date and time is ordinarily not a substantive part of an indictment or information, and that there may be a variance between the dates proved at trial and those alleged in the indictment as long as: "(1) the crime was committed before the return date of the indictment; (2) the crime was committed within the applicable statute of limitations; and (3) the defendant has been neither . . .

surprised nor hampered in preparing his defense." Additionally, the court noted, "[t]he better-reasoned rule appears to be that unless time is a specific element of a certain crime, it is not a substantive, essential part of the indictment."

The crimes in the instant case occurred over a period of time, from July 2009 through March 2011; I.K. could not remember the exact dates of the incidents. *See Ramos v. State*, 75 So. 3d 1277, 1283 (Fla. 4th DCA 2011) (explaining that in child molestation and sexual abuse cases, the law will permit vagueness with respect to the actual dates in which the crimes occurred for general allegations, i.e., a single count[ ] covering a period in which one or more incidents of illegal activity is alleged to have occurred, but greater specificity is required as a foundation for individual counts). Additionally, during his interview with law enforcement, Defendant admitted that the crimes occurred since I.K. returned to Florida in 2009. As counsel would not have ultimately been successful on a motion for statement of particulars and a motion *in limine*, he cannot be found ineffective. *See Dennis*, 109 So. 3d at 693 (counsel cannot be deemed ineffective for failing to raise a meritless issue); *Teffeteller*, 734 So. 2d at 1019–20 (explaining counsel cannot be deemed ineffective for failing to prevail on a meritless issue); *King*, 555 So. 2d at 357–58 (explaining the failure to raise a non-meritorious issue is not ineffectiveness).

Whether a motion for a statement of particulars or a motion *in limine* to exclude other crimes would have succeeded is an issue of state law, and a state court's determination of state law receives deference in a federal court.  Fla. Stat. § 90.401; Fla. R. Crim. P. 3.140(n); *Machin*, 758 F.2d at 1433.  Each count in the information charged a different type of sexual act that occurred between "July 1, 2009 and March 4, 2011."  (Respondent's Exhibit 7, Attachment 1 at 1–3)[2]  At the probable cause hearing, I.K. testified that Harrison sexually abused him between the

---

[2] The information charged (1) anal sex by Harrison on I.K. (count one), (2) touching by I.K. on Harrison (count two), (3) oral sex by Harrison on I.K. (count three), (4) oral sex by I.K. on Harrison (count four), and (5) anal sex by I.K. on Harrison (count five). (Respondent's Exhibit 7, Attachment 1 at 1–3)

summer of 2009 and February 2011.  (Respondent's Exhibit 14, Vol. I at 104–09)

I.K. did not remember when most of the crimes occurred but remembered one

occurred on February 3, 2011.  (Respondent's Exhibit 14, Vol. I at 107)  Because

the State could not have narrowed the time frame, the motion for a statement of

particulars would not have succeeded and, consequently, trial counsel was not

ineffective.  *Pinkney*, 876 F.3d at 1297; *Bettey v. State*, 244 So. 3d 364, 367 (Fla. 1st

DCA 2018).

During his interrogation, Harrison also could not remember exactly when

sexual contact occurred.  Harrison told police that he and I.K. had sexual contact

after I.K. came to Florida in 2009.  (Respondent's Exhibit 7, Attachment 5, State's

Exhibit 2-b at 2–3, 9–10)  I.K. reported the crimes on March 4, 2011.  (*Id.*,

Attachment 4 at 455–56)  During closing argument, the prosecutor reasonably

inferred that Harrison confessed to crimes that occurred in 2011.  *Dessaure v.*

*State*, 891 So. 2d 455, 468 (Fla. 2004).  Because a motion *in limine* to exclude that

reasonable inference would not have succeeded, trial counsel was not ineffective.

*Pinkney*, 876 F.3d at 1297.  Consequently, the state court did not unreasonably apply

*Strickland*.

In his reply, Harrison also asserts that his confession was not trustworthy

because the detectives violated *Miranda* and the prosecutor did not prove beyond a

reasonable doubt that he voluntarily confessed.  (Doc. 16 at 36–37)  As explained

earlier, the detectives complied with *Miranda*.  The prosecution did not have to prove

voluntariness beyond a reasonable doubt.  *Lego v. Twomey*, 404 U.S. 477, 489 (1972)

("[T]he prosecution must prove at least by a preponderance of the evidence that the confession was voluntary.").[3]

## B.  Grounds of IAC During Trial

### Ground Five:

Harrison asserts that trial counsel was ineffective for not impeaching I.K. with prior inconsistent statements.  (Doc. 1 at 12)  The post-conviction court denied the claim as follows (Respondent's Exhibit 7 at 5–6) (state court record citations omitted):

> . . . Defendant alleges ineffective assistance of counsel for failing to impeach I.K.'s trial testimony with his statements to law enforcement. Specifically, he alleges that during trial I.K. described two incidents that occurred in 2011. First, Defendant claims that I.K. testified at trial that Defendant touched I.K.'s penis with his hands until he had an erection, at which point Defendant performed oral sex on him. He argues that in his statement to law enforcement, I.K. only claimed that Defendant performed oral sex on him. Next, Defendant claims that I.K. never told law enforcement that Defendant instructed him to perform oral sex on him, or that he did so. He contends that had counsel impeached I.K. on these points, the jury would have acquitted him on Counts Two and Four.

> This claim is without merit. These are not points on which counsel could have impeached I.K., as I.K.'s statements to law enforcement were not inconsistent with his trial testimony. *See* § 90.608, Fla. Stat. (2011) (explaining that a party may impeach a witness by one or more of the following six methods: (1) by introducing prior inconsistent statements made by the witness; (2) by showing that the witness is biased; (3) by showing the witness has a reputation for untruthfulness; (4) by

---

[3] Harrison asserts for the first time that the State unlawfully amended the information in the middle of trial. (Doc. 1 at 10) This claim of state law error is not cognizable on federal habeas. *Estelle v. McGuire*, 502 U.S. 62, 67 (1991) ("We have stated many times that federal habeas corpus relief does not lie for errors of state law.") (citation and quotations omitted); *State v. Anderson*, 537 So. 2d 1373, 1375 (Fla. 1989) ("[T]he state may substantively amend an information during trial, even over the objection of the defendant, unless there is a showing of prejudice to the substantial rights of the defendant.").

showing that the witness had been convicted of a crime; (5) by challenging the capacity of the witness to observe and relate the facts; or (6) by introducing other evidence to show that the facts are not as the witness testified). Rather, his trial testimony was more detailed than his initial statements. Additionally, I.K.'s adversarial preliminary hearing testimony is consistent with his trial testimony.

Whether I.K.'s statements to police were inconsistent with his trial testimony is an issue of state law, and a state court's determination of state law receives deference in federal courts. *Machin*, 758 F.2d at 1433. Because I.K.'s statements to police did not "directly contradict," and were not "materially different from," his testimony at trial, the statements were not inconsistent, and trial counsel could not use them to impeach I.K. *Pearce v. State*, 880 So. 2d 561, 569 (Fla. 2004).

If I.K. failed to report to police that he performed oral sex on Harrison, trial counsel could have impeached I.K. with that omission. *McBean v. State*, 688 So. 2d 383, 384 (Fla. 4th DCA 1997). Nevertheless, Harrison could not show prejudice under *Strickland*. *Meders v. Warden, Ga. Diag. Prison*, 911 F.3d 1335, 1353–54 (11th Cir. 2019). At the probable cause hearing, I.K. testified that Harrison forced him to perform oral sex. (Respondent's Exhibit 7, Attachment 7 at 9) The prosecutor would have rehabilitated I.K.'s testimony on re-direct examination with that prior consistent statement. *Monday v. State*, 792 So. 2d 1278, 1282 (Fla. 1st DCA 2001). Impeachment with the prior omission would have shown that I.K. was untruthful and I.K. was already heavily impeached. *Pearce*, 880 So. 2d at 569. At trial, I.K. admitted that he had lied under oath twice and his memory was "a little bit" good. (Respondent's Exhibit 14, Vol. VIII at 447–49, 453–54, 457, 478–79)

Consequently, the state court did not unreasonably apply *Strickland*'s prejudice prong.

## Ground Six:

Harrison asserts that trial counsel was ineffective for not adequately examining potential jurors during *voir dire*.  (Doc. 1 at 14)  The post-conviction court denied the claim as follows (Respondent's Exhibit 7 at 6–7):

> . . . Defendant alleges ineffective assistance of counsel for failing to conduct an adequate *voir dire*.  Specifically, he alleges counsel failed to question the prospective jurors on a number of important issues to ascertain their attitudes, beliefs, bias[es], and prejudices. First, he argues counsel failed to question the prospective jurors on the presumption of innocence. Second, he claims counsel failed to question the jurors on whether they had a close friend or relative [who] had been a victim of a violent crime or any crime other than a crime of sexual violence. Third, he asserts counsel failed to question the jurors on whether or not they would give the testimony of law enforcement officers more weight than a regular witness. Fourth, he alleges counsel failed to question Prospective Juror Number 13, Barbara Katsaris, on whether Juror 12, Karen Petersen, said anything to her or any of the other jurors that affected their ability to be fair and impartial. He claims that counsel's failure to adequately question the prospective jurors impaired his right to exercise his peremptory challenges.
>
> This claim is without merit. In *Rosales-Lopez v. United States*, 451 U.S. 182, 188, 101 S. Ct. 1629, 68 L. Ed. 2d 22 (1981), the United States Supreme Court explained that:
>
> > *Voir dire* plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored. Without an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled. *See Connors v. United States*, 158 U.S. 408, 413, 15 S. Ct. 951, 953, 39 L. Ed. 1033 (1895). Similarly, lack of adequate *voir dire* impairs the defendant's right

to exercise peremptory challenges where
provided by statute or rule, as it is in the federal
courts.

(footnote omitted). Accordingly, "[d]uring *voir dire*, counsel
must question prospective jurors so that counsel can reasonably
conclude that 'the juror can lay aside any bias or prejudice
and render a verdict solely on the evidence presented and the
instructions on the law given by the court.'" *Mansfield v. State*,
911 So. 2d 1160, 1172 (Fla. 2005) (quoting *Spencer v. State*,
842 So. 2d 52, 68 (Fla. 2003)). If counsel wholly fails to
question a juror during *voir dire*, counsel's conduct may be
deficient. *See Mansfield*, 911 So. 2d at 1172; *Cole v. State*,
841 So. 2d 409, 415 (Fla. 2003); *Teffeteller v. Dugger*,
734 So. 2d 1009, 1020 (Fla. 1999). In the instant case, the
record clearly establishes that the Court, the State, and
counsel asked sufficient questions of the venire.

### Sub-claim A — Presumption of Innocence

Harrison asserts that trial counsel was ineffective for not asking potential

jurors about the presumption of innocence.  The trial court instructed jurors during

*voir dire* and trial that Harrison was presumed innocent, and the jurors are presumed

to have followed those instructions.  (Respondent's Exhibit 7, Attachment 8

at 80–81, 167–68 and Exhibit 14, Vol. VII at 377–78 and Vol. X at 869)  Harrison did

not demonstrate prejudice under *Strickland*.  *Brown v. Jones*, 255 F.3d 1273, 1279–80

(11th Cir. 2001).

### Sub-claim B — Violent Crime

Harrison asserts that trial counsel was ineffective for not asking potential

jurors about either family or friends who were victims of violent crime.  Even

though trial counsel did not ask the potential jurors about family or friends who were

victims of violent crime, jurors are presumed impartial.  *United States v. Siegelman*,

640 F.3d 1159, 1182 (11th Cir. 2011).  Because he did not identify a juror who was

biased and sat on the jury, Harrison did not demonstrate prejudice under *Strickland*. *Brown*, 255 F.3d at 1279–80; *Smith v. Phillips*, 455 U.S. 209, 215–17 (1982).

### Sub-claim C — Law Enforcement

Harrison asserts that trial counsel was ineffective for not asking potential jurors whether they more heavily weigh testimony from a police officer. Trial counsel asked each potential juror whether police officers are infallible. (Respondent's Exhibit 7, Attachment 8 at 298–301) Potential jurors responded that police officers are like any other person. (*Id.* at 299) The record refutes the sub-claim.

### Sub-claim D — Juror 13

Lastly, Harrison asserts that trial counsel was ineffective for not asking Juror 13 questions. The defense challenged Juror 12 for cause because she was rolling her eyes and whispering to potential jurors sitting next to her during the defense's *voir dire*. (Respondent's Exhibit 7, Attachment 8 at 305–07) The trial court granted the "challenge for cause" and excused Juror 12. (*Id.* at 307)

The state court record does not reveal whether Juror 13 sat next to Juror 12 or what — if anything — Juror 12 whispered to Juror 13. After the trial court excused Juror 12, trial counsel asked Juror 13 about the presumption of innocence, the right against self-incrimination, and the problems with proving a "negative." Juror 13's answers confirmed that she could be fair and impartial. (Respondent's Exhibit 7, Attachment 8 at 309, 317, 328) The trial court instructed all jurors three times that the case must be decided on the evidence presented in the courtroom. (Respondent's

Exhibit 7, Attachment 8 at 79 and Exhibit 14, Vol. VII at 374 and Vol. X at 873)

Juror 13 is presumed to have followed those instructions. *Brown*, 255 F.3d

at 1279–80. Because the record fails to show that Juror 13 was biased, Harrison

failed to demonstrate prejudice. *Miller v. United States*, 562 F. App'x 838, 845

(11th Cir. 2014); *Echevarria v. Dep't Corrs.*, 428 F. App'x 910, 911–12 (11th Cir. 2011).

\* \* \* \*

Because Harrison failed to establish either deficient performance or prejudice,

the state court did not unreasonably apply *Strickland*.

**Ground Seven:**

Harrison asserts that trial counsel was ineffective for not moving for a mistrial

after the prosecutor violated the discovery rules. (Doc. 1 at 16) Also, Harrison

asserts that trial counsel should have moved to exclude the evidence that the

prosecutor did not timely disclose to the defense. (Doc. 1 at 16) The post-conviction

court denied the claims as follows (Respondent's Exhibit 7 at 7) (state court record

citations omitted):

> . . . Defendant alleges ineffective assistance of counsel
> for failing to move for a mistrial. Specifically, he alleges
> I.K. did not make any statements to law enforcement regarding
> an incident of anal intercourse. Despite this fact, the State knew
> of an incident and questioned I.K. on this point during trial.
> Defendant claims this constitutes a discovery violation and that
> counsel should have moved for a mistrial.
>
> This claim is without merit. During an interview with law
> enforcement, Defendant confessed that I.K. performed anal
> intercourse on him. There was no discovery violation and
> no basis for a mistrial. Counsel cannot be found ineffective
> for failing to pursue a non-meritorious issue. *See Dennis*,
> 109 So. 3d at 693 (counsel cannot be deemed ineffective for
> failing to raise a meritless issue); *Teffeteller*, 734 So. 2d

at 1019–20 (explaining counsel cannot be deemed ineffective for failing to prevail on a meritless issue); *King*, 555 So. 2d at 357–58 (explaining the failure to raise a non-meritorious issue is not ineffectiveness).

Whether the prosecutor violated the state discovery rules is an issue of state law, and a state court's determination of state law receives deference in federal courts. *Machin*, 758 F.2d at 1433. A transcript of Harrison's confession confirms that Harrison told police that I.K. had anal intercourse with him. (Respondent's Exhibit 7, Attachment 5, State Exhibit 1-b at 54 and State Exhibit 2b at 3) The prosecutor did not violate the discovery rules. Fla. R. Crim. P. 3.220(b). Harrison's defense at trial was that I.K. raped him by anal intercourse. Even if the prosecutor failed to timely disclose I.K.'s statement about the anal intercourse, the discovery violation would not have procedurally prejudiced the defense. *State v. Schopp*, 653 So. 2d 1016, 1020 (Fla. 1995) ("[T]he defense is procedurally prejudiced if there is a reasonable possibility that the defendant's trial preparation or strategy would have been materially different had the violation not occurred."). Because the motion for a mistrial and motion to exclude testimony would not have succeeded, trial counsel was not ineffective. *Pinkney*, 876 F.3d at 1297. Consequently, the state court did not unreasonably apply *Strickland*.

## VI. <u>CONCLUSION</u>

Harrison fails to meet his burden to show that the state court's decision was either an unreasonable application of controlling Supreme Court precedent or an unreasonable determination of fact. As *Burt v. Titlow*, 571 U.S. 12, 19–20 (2013), states, an applicant's burden under Section 2254 is difficult:

> Recognizing the duty and ability of our state-court colleagues to adjudicate claims of constitutional wrong, AEDPA erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court. AEDPA requires "a state prisoner [to] show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error . . . beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. [86, 103] (2011). "If this standard is difficult to meet" — and it is — "that is because it was meant to be." *Id.*, at [102]. We will not lightly conclude that a State's criminal justice system has experienced the "extreme malfunctio[n]" for which federal habeas relief is the remedy. *Id.*, at [103] (internal quotation marks omitted).

Harrison's application for the writ of habeas corpus (Doc. 1) is **DENIED**.

The clerk must enter a judgment against Harrison and **CLOSE** this case.

## DENIAL OF BOTH
## A CERTIFICATE OF APPEALABILITY
## AND LEAVE TO APPEAL *IN FORMA PAUPERIS*

Harrison is not entitled to a certificate of appealability ("COA"). A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his application. 28 U.S.C. § 2253(c)(1). Rather, a district court must first issue a COA. Section 2253(c)(2) permits issuing a COA "only if the applicant has made a substantial showing of the denial of a constitutional right." To merit a COA, Harrison must show that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues he seeks to raise. *See* 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 478 (2000); *Eagle v. Linahan*, 279 F.3d 926, 935 (11th Cir. 2001).

Because he fails to show that reasonable jurists would debate either the merits of the grounds or the procedural issues, Harrison is entitled to neither a COA nor leave to appeal *in forma pauperis.*

A certificate of appealability is **DENIED.**  Leave to appeal *in forma pauperis* is **DENIED.**  Harrison must obtain permission from the circuit court to appeal *in forma pauperis.*

ORDERED in Tampa, Florida, on September 30, 2020.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE